**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-4429**

UNITED STATES OF AMERICA,

              Plaintiff - Appellee,

        v.

PATRICK G. TZEUTON,

              Defendant - Appellant.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.   Peter J. Messitte, Senior District Judge.  (8:08-cr-00094-PJM-1)

Argued:  January 29, 2010          Decided:  March 16, 2010

Before WILKINSON and AGEE, Circuit Judges, and R. Bryan HARWELL, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed by unpublished per curiam opinion.

**ARGUED**: Brian W. Stolarz, Christopher Tate, K&L GATES, LLP, Washington, D.C., for Appellant.  Steven M. Dunne, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellee.  **ON BRIEF**: Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Patrick G. Tzeuton ("Tzeuton") appeals his convictions upon one count of conspiracy to commit immigration fraud pursuant to 18 U.S.C. § 371, seven counts of immigration fraud pursuant to 18 U.S.C. § 1546(a), and one count of obstruction of an official proceeding pursuant to 18 U.S.C. § 1512(c)(2), as well as his sentences. For the following reasons, we affirm the convictions and sentences imposed by the district court.

I.

Tzeuton, an attorney, practiced law through a law firm known as the Law Offices of Patrick Tzeuton & Associates (hereinafter "the Tzeuton law firm"). Henri Marcel Nzone ("Nzone"), originally Tzeuton's co-defendant, worked closely with Tzeuton as his legal assistant, but Nzone was not an attorney. The Tzeuton law firm primarily represented clients in immigration matters before the Immigration and Naturalization Service ("INS").

Tzeuton and Nzone were indicted upon allegations that they conspired to "prepare[] false and fraudulent Applications for Asylum and for Withholding of Removal," make "false and fraudulent supporting affidavits and documents, and present[] these false and fraudulent applications, affidavits, and supporting documents to the INS" and other agencies. (J.A. 23).

2

The indictment also alleged that Tzeuton and Nzone sold false documents to aliens applying for asylum, notarized and translated false documents, and "met with aliens before their asylum interviews and coached the aliens on the details of the false and fraudulent statements in their asylum applications." (J.A. 24). Nzone pled guilty to one count of conspiracy and one count of obstruction of an official proceeding and received a sentence of 9 months' imprisonment. Tzeuton pled not guilty and proceeded to trial.

During trial, seven former clients of the Tzeuton law firm, Nzone, and ICE Special Agent Chris Melia ("Melia") testified for the prosecution. Nzone and the former clients testified that Tzeuton conspired with them to "make false statements under oath," "present false and fraudulent applications for asylum," "to corruptly obstruct, influence, and impede immigration proceedings before the U.S. Department of Homeland Security and the U.S. Department of Justice," and to sell "false and fictitious documents." (J.A. 876). Testimony at trial also established that Tzeuton "directed these former clients to Nzone and others in his office to prepare the clients for interviews with asylum officers and immigration court proceedings by coaching the clients on the details of the false and fraudulent stories that the defendant created for them." (J.A. 876).

The jury convicted Tzeuton on all counts. Alleging prosecutorial misconduct, Tzeuton filed a post-trial motion to dismiss the indictment or, alternatively, for a new trial, for a post-trial evidentiary hearing, and for appropriate discovery. The district court held a hearing and subsequently denied the motion. Tzeuton was sentenced to sixty months' imprisonment on the conspiracy count and sixty-four months' imprisonment on all remaining counts, to run concurrently. Tzeuton timely filed an appeal and this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

II.

A.

1.

Tzeuton first argues that the prosecution engaged in misconduct by improperly threatening Kamba Kabangu ("Kabangu"), a proposed defense witness, and that the district court consequently erred by denying his post-trial motion to dismiss on that basis. Kabangu had referred numerous Congolese asylum cases to Tzeuton.

Tzeuton contended in his motion that "when the government's case was almost complete," the prosecution "alleged that Immigrations and Customs Enforcement ("ICE") had evidence that Mr. Kabangu was in the United States illegally, and that he had

4

been banned from certain immigration courtrooms for false testimony," (J.A. 557), and "that ICE agents planned to arrest Mr. Kabangu if he arrived in the Court." (J.A. 558). Tzeuton objected to the timing of the disclosure, alleging that "government counsel knew [this information] two weeks before [Kabangu] was scheduled to testify." (J.A. 552). Defense counsel proffered to the district court that Kabangu would testify in accord with a pre-trial meeting with defense counsel, where Kabangu stated that "Nzone was widely regarded as a fraud and a liar," (J.A. 555), that "he did not believe that Mr. Tzeuton had committed any fraudulent activities, and felt Mr. Tzeuton was being 'framed' by other employees." (J.A. 554).

Based on the information disclosed by the prosecution, the district court appointed Kabangu a lawyer, and he ultimately decided not to testify. Tzeuton argues that the prosecution's conduct "violated the Defendant's fundamental due process rights to present a defense by interfering with the free and unhampered choice of the witness to testify." (J.A. 551). However, no affidavits were filed in support of the motion to dismiss by Tzeuton, Kabangu, their counsel, or anyone else.

In denying the motion, the district court first found that "any purported evidence that Kabangu would give about Mr. Nzone would be quite marginal to [the prosecution's evidence] so . . . it's hard to even conclude . . . that there was deprivation of

5

the right of a fair trial." (J.A. 772). Moreover, with no evidentiary foundation for any of Tzeuton's claims about Kabangu, the district court stated that "I have what really is clearly third-hand testimony" from Tzeuton's counsel. (J.A. 773). Finally, the district court found that Kabangu likely "wouldn't have testified anyway, given his vulnerability to cross-examination for other criminal activity," (J.A. 776), and that there was no prosecutorial misconduct, because "I think it's an awkward situation for everybody because they could have been damned if they did and damned if they didn't. But [the prosecution], I think largely are being held to answer for good intentions." (J.A. 777).

We review the denial of a motion to dismiss based on prosecutorial misconduct for clear error. United States v. McDonald, 61 F.3d 248, 253 (4th Cir. 1995), overruled on other grounds by United States v. Wilson, 205 F.3d 720 (4th Cir. 2000).

In order to prove reversible prosecutorial misconduct, a defendant must first show that the prosecution acted improperly. "Improper intimidation of a witness may violate a defendant's due process right to present his defense witnesses freely if the intimidation amounts to 'substantial government interference with a defense witness' free and unhampered choice to testify." United States v. Saunders, 943 F.2d 388, 392 (4th Cir. 1991)

6

(quoting United States v. Hammond, 598 F.2d 1008, 1012 (5th Cir. 1979)). Next, if "a defendant is able to establish a substantial government interference, the inquiry moves to the question of whether it was prejudicial or harmless error." Saunders, 943 F.2d at 392.

The district court did not err in finding that the prosecution did not act improperly. There is no evidence of any direct conversations or contact between government agents and Kabangu.[1] Instead, the prosecution communicated its concerns about Kabangu in open court, in front of defense counsel. Furthermore, the dual responsibility of prosecutors puts them in a position of, as the district court put it, being "damned if they did and damned if they didn't." (J.A. 777). In United States v. Rivera, this Court considered the similar issue of witnesses made unavailable by deportation and noted that "[t]he United States Attorney had a dual responsibility in this case. It was his duty to consider the rights of the witnesses, as well as the rights of the appellant, and to also comply with his duty of deporting the illegal aliens without undue delay." 859 F.2d 1204, 1207 (4th Cir. 1988).

---

[1] Tzeuton's allegation that an anonymous ICE agent called and threatened Kabangu is wholly without evidentiary support. No affidavit or testimony from Kabangu or his attorney supports the claim; thus, the district court did not clearly err in concluding that the claim had no factual merit.

Moreover, the district court did not clearly err when it found that, even if the prosecution had acted improperly, Tzeuton was not unduly prejudiced by Kabangu's failure to testify. Defense counsel proffered that Kabangu would have testified to Nzone's bad character and his belief that Tzeuton was not guilty. However, this evidence would have been marginal compared to the overwhelming evidence presented against Tzeuton at trial; Nzone and seven former clients testified that Tzeuton conspired to create, sell, and submit fraudulent asylum applications. Furthermore, testimony that Nzone was a bad actor and a criminal would have been cumulative; the government itself stated during closing that

> I agree with almost everything [the defense] said about Mr. Nzone's character. I agree that in the past Mr. Nzone, he lied and he lied, and he lied again. I agree, I think the phrase he used is that he's a master fraudster. I agree with that. I agree that some of the things he did in the past to try to get papers in this country were despicable.

(J.A. 415). Finally, the value of Kabangu's testimony to the defense would be questionable because, if he did testify, the prosecution would have undoubtedly impeached Kabangu with his past acts of dishonesty and his possible status as an illegal alien. Consequently, the district court did not clearly err by denying Tzeuton's post-trial motion to dismiss on the basis of prosecutorial misconduct.

8

2.

Tzeuton argues for the first time on appeal that the prosecution also committed prosecutorial misconduct during closing argument. First, Tzeuton objects to comments which he contends "constitut[ed] personal attacks on defense counsel and impl[ied] that the defense attempted to trick or deceive the jury." (Appellant's Br. 20). Specifically, Tzeuton points to the prosecution's remarks that defense counsel "want to try to distract you;" "want to try to change the subject;" are "throw[ing] mud;" are trying to "divert your attention;" (J.A. 397); and "really sort of tried to mislead you." (J.A. 411). Second, Tzeuton contends that the prosecution's statement that "[w]hen either Mr. Tzeuton or Mr. Nzone sold fake documents, they had a deal. They'd split it 50/50. And it's up to you to decide whether Mr. Nzone is a credible witness, but I find that pretty credible that they would split things 50/50," constituted improper vouching and/or bolstering. (J.A. 418).

Because defense counsel did not object during closing, we review this claim for plain error. United States v. Adam, 70 F.3d 776, 780 (4th Cir. 1995). Under plain error review, the defendant has the burden of establishing that (1) an error occurred; (2) the error was "clear or obvious;" and (3) the error affected the defendant's substantial rights. Puckett v. United States, 129 S. Ct. 1423, 1429 (2009).

9

As set forth in the previous section, "[t]he test for reversible prosecutorial misconduct generally has two components: that '(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial.'" United States v. Brockington, 849 F.2d 872, 875 (4th Cir. 1988), abrogated on other grounds by Bailey v. United States, 516 U.S. 137 (1995) (quoting United States v. Hernandez, 779 F.2d 456, 458 (8th Cir. 1985)). In determining whether a defendant was prejudiced, this Court considers the following factors:

> (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

United States v. Harrison, 716 F.2d 1050, 1052 (4th Cir. 1983). Ultimately, "[t]he relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986) (internal quotations omitted).

Although it is important that "prosecutors refrain from impugning, directly or through implication, the integrity or

10

institutional role of their brothers and sisters at the bar who serve as defense lawyers," United States v. Ollivierre, 378 F.3d 412, 420 (4th Cir. 2004), vacated on other grounds by 543 U.S. 1112 (2005) (internal citations omitted), there is no evidence that any of the statements to which Tzeuton objects as "personal attacks on defense counsel" meet this definition of improper behavior.  Although a prosecutor may not strike "foul" blows, he "may strike hard blows" and "may prosecute with earnestness and vigor—indeed, he should do so." Berger v. United States, 295 U.S. 78, 88 (1935).  The prosecutor did that in this case.

Furthermore, even if we assume that the remarks were improper, we conclude that they did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181.  The remarks to which Tzeuton objects were isolated, the proof of Tzeuton's guilt at trial was strong, and there is no evidence that the remarks were made in bad faith to "divert attention to extraneous matters."

Tzeuton's allegation that the prosecution prejudicially vouched for or bolstered Nzone's testimony is also without merit.  Although "[i]t is impermissible for a prosecutor to vouch for or bolster the testimony of government witnesses in arguments to the jury," United States v. Sanchez, 118 F.3d 192, 198 (4th Cir. 1997), the prosecution's remark about the "credibility" of a portion of Nzone's testimony was not

11

reversible error. While the prosecution apparently did "suggest

. . . personal belief about the credibility of [a] witness,"

id., at least as to Nzone's testimony that he and Tzeuton split

the proceeds of the conspiracy, there is no evidence that the

remark was prejudicial. The method of splitting proceeds and

whether they were split "50/50," is not particularly relevant to

the case or to Tzeuton's guilt. The prosecution's comment about

Nzone's credibility was confined only to that statement.

Ultimately, "proof of [Tzeuton's] guilt was quite strong and the

comment . . . was, at best, peripheral to the credibility of one

single source of incriminating evidence." Id. at 199.


B.

Tzeuton next argues that the district court erred when it

denied his motion for an evidentiary hearing as to whether an

ICE agent called and threatened Kabangu. On appeal, this Court

reviews a district court's denial of an evidentiary hearing in

support of a motion for a new trial for an abuse of discretion.

United States v. Smith, 62 F.3d 641, 651 (4th Cir. 1995).

"Just as the district court has broad discretion in

resolving a new trial motion, so too does it enjoy discretion

whether to hold an evidentiary hearing on the motion." Id.

(internal citations omitted); see also United States v.

Connolly, 504 F.3d 206, 220 (1st Cir. 2007) (holding that

12

"evidentiary hearings on new trial motions in criminal cases are the exception rather than the rule"). This is because "the acumen gained by a trial judge over the course of the proceedings" makes the court "well qualified" to rule on a motion for a new trial without an evidentiary hearing. United States v. Hamilton, 559 F.2d 1370, 1373-74 (5th Cir. 1977).

The district court did not abuse this broad discretion by denying Tzeuton's motion for an evidentiary hearing. The district court found that, in part because there was no affidavit from Kabangu or his lawyer and only "third-hand testimony" as to the alleged ICE agent call,

> [t]his is simply not the kind of case where the Court opens up a post-trial investigation into the way the government and its agents acted. If there was a serious credible threat that Kabangu himself could set forth with some specifics about who called him when and did whatever, that might be a different story as to the alleged call by the ICE agent, but we don't have anything from him or from his attorney.

(J.A. 773). This conclusion was within the district court's discretion, particularly considering the fact that there was no affidavit from Kabangu or his attorney. See United States v. Slocum, 708 F.2d 587, 600 (11th Cir. 1983); United States v. Hill, 78 Fed. Appx. 223, 225 (4th Cir. 2003) (unpublished) (holding that it was not an abuse of discretion for a district court to deny a motion for an evidentiary hearing when the motion makes only a "bald assertion of error").

13

C.

Tzeuton next contends that the district court abused its discretion by giving the jury a "willful blindness" or "Jewell" instruction,[2] and that the district court abused its discretion by "refusing to propound a modified willful blindness instruction based on the attorney client privilege" (Appellant's Br. 1), which Tzeuton proposed. This Court reviews a trial court's jury instructions for an abuse of discretion. United States v. Jeffers, 570 F.3d 557, 566 (4th Cir. 2009).

Although "[c]ourts often are wary of giving a willful blindness instruction," United States v. Mancuso, 42 F.3d 836, 846 (4th Cir. 1994), it is "proper when the defendant asserts a lack of guilty knowledge but the evidence supports an inference of deliberate ignorance." United States v. Ruhe, 191 F.3d 376, 384 (4th Cir. 1999) (internal quotations omitted). "Courts therefore restrict the use to cases not only where there is asserted lack of knowledge but also where there is evidence of deliberate ignorance." Mancuso, 42 F.3d at 846. The instruction "allows the jury to impute the element of knowledge to the

---

[2] The district court instructed the jury that "the government can also meet its burden of showing that the defendant had knowledge of the falsity of the statements if it . . . establishes beyond a reasonable doubt that the defendant acted with deliberate disregard of whether the statements were true or false, or with a conscious purpose to avoid learning the truth." (J.A. 277-78).

14

defendant if the evidence indicates that he purposely closed his eyes to avoid knowing what was taking place around him." United States v. Schnabel, 939 F.2d 197, 203 (4th Cir. 1991). "If the evidence supports both actual knowledge on the part of the defendant and deliberate ignorance, a willful blindness instruction is proper." Ruhe, 191 F.3d at 384.

Although the prosecution emphasized that Tzeuton had actual knowledge, the evidence could also have supported a finding of deliberate ignorance. In fact, the thrust of the defense was that Tzeuton was not aware of the criminal activity that was occurring around him. For example, during closing argument defense counsel blamed other employees for the fraud, admitting that Tzeuton may have been "negligent," "[s]loppy," or guilty of malpractice. (J.A. 364). In fact, Tzeuton himself stated that "he had grown suspicious of the documents and their validity, but the clients convinced or misled him." (J.A. 179). Tzeuton also "stated that he had heard of other employees in his law office who may have committed fraud and prepared fraudulent documents." (J.A. 183); see United States v. Mir, 525 F.3d 351, 359 (4th Cir. 2008) ("The record contains myriad examples of [the defendant] attempting to shift the blame for the . . . fraud onto his employees, claiming he was unaware of any criminal activity. This is the type of situation for which a willful blindness instruction was intended . . . .").

15

Therefore, the district court did not abuse its discretion in instructing the jury. A jury could have found that Tzeuton "suspected the fact [of criminal activity]; . . . realised its probability; but . . . refrained from obtaining the final confirmation because he wanted in the event [he was apprehended] to deny knowledge." United States v. Jewell, 532 F.2d 697, 700 n.7 (9th Cir. 1976).[3]

D.

Finally, Tzeuton contends that the district court erred during sentencing by (1) failing to consider all of the sentencing factors of 18 U.S.C. § 3553(a), and (2) by enhancing Tzeuton's sentence by four levels based on his role as organizer or leader of the criminal activity pursuant to U.S.S.G. § 3B1.1(a).

"Pursuant to Gall v. United States, 128 S. Ct. 586, 590 (2007), we review the sentences imposed by the district court under a deferential abuse of discretion standard." United States v. Harvey, 532 F.3d 326, 336 (4th Cir. 2008). "In assessing

---

[3] Nor did the district court abuse its discretion in refusing to give the modified version of the willful blindness jury instruction proposed by Tzeuton. Tzeuton cites no case law supporting his proposed instruction, and the instruction given in this case, (J.A. 277-78; 493), is fundamentally similar to the example found in Federal Jury Practice and Instructions.

16

whether a sentencing court properly applied the Guidelines, 'we review the court's factual findings for clear error and its legal conclusions de novo.'" United States v. Osborne, 514 F.3d 377, 387 (4th Cir. 2008) (quoting United States v. Allen, 446 F.3d 522, 527 (4th Cir. 2006)). "Clear error occurs when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Harvey, 532 F.3d at 336-37 (internal quotations omitted).

1.

When determining an appropriate sentence, a district court "need not robotically tick through § 3553(a)'s every subsection," but should "provide [this court] an assurance that the sentencing court considered the § 3553(a) factors with regard to the particular defendant." United States v. Moulden, 478 F.3d 652, 657 (4th Cir. 2007) (internal quotations and citation omitted). "A court must . . . provide a sufficient explanation so that we may effectively review the reasonableness of the sentence." Id.

The district court in this case did exactly that. The court discussed in detail several § 3553(a) factors and imposed a presumptively reasonable sentence within the guidelines range. See United States v. Montes-Pineda, 445 F.3d 375, 379 (4th Cir.

17

2006) ("As we have held repeatedly, a sentence within a properly calculated advisory Guidelines range is presumptively reasonable."). In fact, during sentencing, the court explicitly stated that it "really need[ed] to consider the factors under 18 U.S.C. Section 3553. I mean, is this aberrant behavior, was he under diminished capacity, is he rehabilitated in some way." (J.A. 852). See United States v. Johnson, 445 F.3d 339, 345 (4th Cir. 2006) ("While the district court's specific reference to § 3553 was certainly not required, it may well have been sufficient.").

The district court then went on to consider particular § 3553(a) factors as they applied to Tzeuton, including the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The district court noted "the nature and circumstances of the offense," finding that "this is a serious offense," a fraud that "went on over an extended period of time," and a conspiracy "to defeat the purposes of the government to regulate immigration." (J.A. 852, 854). The district court considered the fact that Tzeuton was a lawyer and had been "taking advantage . . . of people with limited knowledge of either the language or the legal system . . . ." (J.A. 852-53). The court then pointed out that "[t]he defendant . . . continues to maintain that he did nothing wrong, which is somewhat problematic here. . . .

18

[O]ne wonders whether the defendant, were he able to go back and practice law again, might do the same thing if he doesn't think what he did here was wrong." (J.A. 853). The court also considered the need to "provide just punishment for the offense," see § 3553(a)(2)(A), noting the "punishment component" at issue in this case. (J.A. 854). The district court also considered the need "to afford adequate deterrence," see § 3553(a)(2)(B), pointing out that the court "needs to promote respect for law and to deter others who would do what he did, other lawyers who would be involved in the same kind of activity." (J.A. 854). The record thus shows that district court sufficiently considered the § 3553(a) factors with regard to Tzeuton.

2.

Tzeuton next challenges the district court's factual finding that the offense involved five or more participants, and consequently its imposition of the § 3B1.1(a) sentencing enhancement. "Under § 3B1.1(a), a court may increase a defendant's offense level by four if the defendant 'was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.'" Harvey, 532 F.3d at 337. "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have

19

been convicted." § 3B1.1 cmt. n. 1. Tzeuton does not challenge the determination that he was an "organizer or leader," but instead asserts that the district court clearly erred in finding that the conspiracy "involved five or more participants."

During sentencing, the district court questioned the prosecution, asking "[w]ho are the five" participants in the criminal activity necessary to support the enhancement. (J.A. 802). The prosecution named Tzeuton, Nzone, "Mr. Bah," Kevin Patcha ("Patcha") and Peter Nyoh ("Nyoh"), lawyers who worked at the office, Goodwill Tachi ("Tachi"), and seven former clients who lied to the INS, among others, insisting that "they are all absolutely criminal participants in this conspiracy." (J.A. 802). The district court found that Nzone and the other employees were "criminally responsible" on "the basis of the testimony of one person that somebody told them to fabricate evidence." (J.A. 809). The court found that the clients were "involved in criminal activity" within the meaning of the enhancement because "[t]hey knew they were fabricating evidence." (J.A. 807). Thus, the district court concluded that "there are at least five" participants in the conspiracy. (J.A. 808).

The district court did not clearly err in finding that there were at least five participants in the conspiracy. First, Tzeuton himself, "as principal, should be included as a

participant." United States v. Fells, 920 F.2d 1179, 1182 (4th Cir. 1990). Furthermore, the record supported the district court's conclusion that several employees knowingly coached clients to lie. Koumba Tchiam ("Tchiam"), a former client, testified that Nyoh "asked her to get a letter from her sister pretending to be her mother to support her false application that he typed up." (J.A. 804). Tchiam also testified that Patcha coached her to lie. Bintou Cisse, another former client, testified that Tachi coached her to lie.

Finally, seven former clients testified during trial as to their participation in the conspiracy. Even though not ultimately charged with an offense, the former clients were also "criminally responsible for the commission of the offense," as the "illegal scheme would not have succeeded without the[ir] participation." United States v. Turner, 102 F.3d 1350, 1360 (4th Cir. 1996). Thus the record supports the district court's conclusion, and the court did not clearly err.

III.

For the foregoing reasons, we hold that the district court did not err in denying Tzeuton's motion to dismiss and no prosecutorial misconduct occurred during closing argument. The district court did not abuse its discretion in denying Tzeuton's motion for an evidentiary hearing or in giving the jury a

"willful blindness instruction," and did not impose an unreasonable sentence. Accordingly, Tzeuton's convictions and sentences are

AFFIRMED.